IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CAROL MESSENHEIMER, | ) | |
| | ) | CASE NO. 5:17-cv-738 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COASTAL PET PRODUCTS, INC., | ) | KATHLEEN B. BURKE |
| | ) | |
| Defendant. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |

Plaintiff Carol Messenheimer ("Messenheimer") brings this action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*., and Ohio law, O.R.C. § 4112.02, against her employer, Coastal Pet Products, Inc. ("Coastal"). She alleges that Coastal discriminated against her on the basis of disability, limitations associated with Meniere's disease, by demoting her and by failing to accommodate her disability. She also claims that Coastal retaliated against her for engaging in a protected activity in violation of the ADA.

Coastal has filed a Motion for Summary Judgment on all of Messenheimer's claims pursuant to Federal Rule Civil Procedure 56 ("the Motion"). Doc. 26. Messenheimer has filed an Opposition brief, Doc. 41, and Coastal has filed a Reply, Doc. 43. As set forth below, Coastal has shown that it demoted Messenheimer due to her documented poor managerial record; it has also shown that she never requested an accommodation and that it had no notice that she had a hearing problem resulting from her Meniere's disease. Messenheimer has failed to provide evidence to the contrary or to show that Coastal's reason for demoting her was pretextual.

Accordingly, there is no genuine issue of material fact and Coastal is entitled to summary judgment.

## I. BACKGROUND FACTS

Coastal Pet Products, Inc., manufactures and distributes "pet restraint products, including leashes, collars and related pet accessories." Doc. 27, p. 6 (Def.'s Memo. in Support of MSJ). Coastal hired Messenheimer in 1980 as a factory worker, also known as an associate. Doc. 1, p. 2, ¶7 (Complaint); Doc. 34-3, p. 1 (Aug. 2012 Performance Evaluation). In 2005, Messenheimer was promoted to the position of supervisor in Coastal's Distribution Department where she supervised a team of associates and shift-leaders, also referred to as Work Force Coordinators ("WFC"s). Doc. 34, p. 1, ¶ 3; Doc. 34-4, p. 1. In 2014, she was demoted to associate. Doc. 34-4, p. 1 (Feb. 2013 Annual Review); Doc. 36-1, p. 1 (Sept. 2014 Employee Warning Report).

### A. Messenheimer is diagnosed with Meniere's disease in 2008-2009.

Sometime in 2008-2009, Messenheimer was diagnosed with Meniere's disease, "a disorder of the inner ear which . . . causes symptoms of vertigo and fluctuating hearing loss to permanent hearing loss." Doc. 1, p. 2, ¶9; Doc. 38, pp. 41-42 (Messenheimer Dep.). Messenheimer takes medication that allows her to manage her symptoms and, due to "severe hearing loss," she has used hearing aids since June 2014. Doc. 38, pp. 44, 50, 55. Even with her hearing aids, she reports having some difficulty hearing in noisy environments. Doc. 38, p. 55. At the time she was diagnosed, Messenheimer did not inform Coastal that she had Meniere's disease.

### B. Messenhimer receives warnings from Reese and Gordon about her performance while supervising in Area C.

When Messenheimer first became a supervisor in 2005, she was assigned to Area C in Coastal's Distribution Department and was overseeing two WFCs and approximately 12

associates. Doc. 34, p. 1, ¶ 3 (McGavern Aff.). Her main responsibilities were to (1) maintain safety standards, (2) train her associates and WFCs, (3) ensure quality control, (4) facilitate communication between associates, management, and workers on different shifts, (5) coach and lead her associates and WFCs using positive reinforcement, and (6) provide biannual employee assessments. Doc. 33-4, pp. 1-2.

Messenheimer's performance evaluations indicate that she exceeded expectations in the areas of safety, quality control, and training; however, beginning in 2009, she was repeatedly warned by her manager, Jason Reese, that she needed to improve her communications with fellow supervisors and her ability to instruct those whom she supervised in a calm and composed manner. Doc. 35, p. 1, ¶ 2 (Gordon Aff.). Specifically, Messenheimer received warnings regarding her managerial style at least four times between November 2009 and July 2011. Doc. 35, p. 1, ¶ 2. In her deposition, Messenheimer initially denied that she received warnings regarding her managerial style prior to 2011; however, later in her deposition, she confirmed that Reese met with her and discussed her demeanor as early as 2009. Doc. 38, pp. 81, 96.

On July 15, 2011, Reese brought Messenheimer's managerial issues to the attention of Eric Gordon ("Gordon"), Coastal's Company Distribution Manager. Doc. 35, p. 1, ¶ 2. As Distribution Manager, Gordon is the person who "oversees all functions of distribution" and who would "make a decision whether to demote" a Distribution Department employee. Doc. 40, pp. 8, 11 (Smith Dep.). Reese and Gordon met with Messenheimer to discuss her demeanor and the manner in which she directed her associates. Doc. 35-1, p. 1. The minutes from the meeting were laid out in a Communication/Counseling Report:

> It was brought to our attention by an[] associate that we were having issues with Carol and the demeanor she was using to instruct associates in their daily job functions. She was also not being consistent in the instruction that was being given. This was the 4th such complaint since November of 2009. Carol needs to

> address associates in a calmer demeanor and give clearer, calmer direction.
> Associates should know what to expect. Carol needs to be more constructive
> when addressing errors/reprimands and address them outside of the group.

Doc. 35-1, p. 1.

The Communication/Counseling Report also reflects that "Carol expressed that she was unhappy and had been for a while. Carol was asked if she wanted a change or if she wanted to step down. . . . [S]he did not know." Doc. 35-1, p. 1. Messenheimer disagreed with the problems raised in the Report and told them "there was [sic] two sides to every story and that they were listening to what the others were saying . . . ." Doc. 38, p. 78. Even so, she made an effort to start using phrases like "please" and "thank you" and "good job." Doc. 38, p. 78.

### C. Messenheimer receives an Employee Warning Report from McGavern and Gordon for her performance in Area C and is transferred to another department.

On April 2, 2012, Shawn McGavern replaced Reese as Messenheimer's manager in Area C. Doc. 34, p. 1, ¶¶ 1-2. McGavern witnessed Messenheimer act "rudely and negatively toward associates and WFCs in her area" and five WFCs stepped down or transferred to other areas, due, at least in part, to Messenheimer's demeanor toward them. Doc. 34, p. 1, ¶ 7. Messenheimer agrees that the WFCs left her area "because of problems they had with [her]." Doc. 38, p. 98.

In August 2012 and February 2013, McGavern brought up these issues in Messenheimer's mid-year and annual reviews. Doc. 34-3, p. 1 (Aug. 2012 Performance Evaluation); Doc 34-4, pp. 1-3 (Feb. 2013 Performance Evaluation). McGavern also held weekly meetings throughout January and February of 2013 with Messenheimer, her WFCs, and her associates "where he attempted to remedy the problems that were raised." Doc. 34, p. 1, ¶ 8. In her deposition, Messenheimer reported that she believed that the employees who complained

about her "had it out for [her]," and she did not take any sort of remedial action because she "didn't feel [she] was doing anything wrong." Doc. 38, pp. 93-94.

In July of 2013, McGavern brought Messenheimer's continuing performance issues to Gordon's attention. Doc. 35, p. 1, ¶ 4. Together, they issued an Employee Warning Report and met with Messenheimer on July 29, 2013, to discuss her ongoing managerial issues. Doc. 35, p. 1, ¶ 6. Gordon told Messenheimer that he was transferring her to a different supervisory position in a different department, Coastal's Labeling Department. He explained that "there were issues in her current department and her managers wanted to give her a clean slate to be able to be successful as a supervisor at Coastal Pet." Doc. 40, p. 6. Her new position would also require her to supervise fewer employees. Doc. 36, p. 1, ¶¶ 1-2 (Perkins Aff.). Gordon told her that she would have "90 days to make the needed changes" or she would be "removed from the Supervisor's position." Doc. 34-5, p. 1. During the meeting, Messenheimer denied any problems with her managerial style and conveyed that she believed the associates who had complained about her were not being truthful. Doc. 35, p. 1, ¶ 6. However, she agreed that it was a good decision to give her a clean slate with new associates. Doc. 38, p. 103.

Messenheimer still did not inform McGavern or Gordon that she has Meniere's disease and any related limitations.

### D.  Messenheimer receives more complaints about her performance in the Labeling Department and is demoted.

Upon her transfer to the Labeling Department in July 2013, Messenheimer worked under the management of Barbara Perkins and supervised one WFC and five associates. Doc. 36, p. 1, ¶¶ 1-2. Messenheimer alleges that, during her orientation, Perkins commented, "I hope you don't have any problems going up and down ladders because the previous supervisor, that's what she would have to do." Doc. 38, p. 106. Perkins testified in her deposition that her comment

was something she would typically say to people joining the department because it was part of the job function in the Labeling Department. Doc. 39, p. 5. Messenheimer confirmed that Labeling Department employees regularly had to climb a ten-foot ladder to unjam a conveyor. Doc. 38, p. 106. Though Messenheimer had concerns about climbing ladders due to her vertigo, she did not ask for an accommodation or respond at all to Perkins' comment. Doc. 38, p. 106. Perkins stated that, at that time, she "had a general understanding that [Messenheimer] suffered from bouts of vertigo" but did not know that she had any hearing problems. Doc. 36, p. 1, ¶8.

Messenheimer initially performed well in her new position[1]; however, a year later, around September 2014[2], Perkins began to receive complaints regarding Messenheimer's demeanor from one of the associates Messenheimer supervised, Tabitha Early. Doc. 36, p. 1, ¶¶ 2-3. Early reported that Messenheimer was rude to associates and would "walk away a lot" when associates were trying to ask her questions. Doc. 39, pp. 5-7 (Perkins Dep.). Perkins investigated the complaint by interviewing other individuals who worked with Messenheimer and she received several other reports confirming Messenheimer's treatment of associates.[3] Doc. 39, p. 8.

---

[1] After her transfer, Messenheimer's performance was evaluated by Perkins every thirty days for three months. On all three evaluations, Perkins noted that Messenheimer was demonstrating good leadership qualities and was communicating well with her associates. Doc. 41-6, pp. 1-3 (Monthly Supervisor Performance Evaluations).

[2] In Perkins' affidavit, she states, "In July of 2014, I began to receive complaints from Associates and the WFC in [Messenheimer's] area regarding her demeanor." Doc. 36, p. 1, ¶ 3. Coastal cites Perkin's affidavit in support of its Motion for Summary Judgment, to support its statement that "Perkins received complaints from two associates and a WFC regarding the Plaintiff's demeanor and treatment of either themselves or other employees." In Perkins' deposition, she recalled that she did not receive the first complaint until September 17, 2014, one day prior to when Messenheimer went on medical leave. Doc. 39, p. 8. Messenheimer stated in her deposition that the initial complaint from Tabitha Early was made on September 17, 2014. Doc. 38, p. 109. Thus, it is undisputed that Perkins received complaints regarding Messenheimer's demeanor before or on September 17, 2014, and that she shared those complaints with Gordon on September 17, 2014.

[3] During her investigation of Early's complaint, the WFC who worked under Messenheimer's supervision reported that Messenheimer mistreated her associates and a fellow supervisor stated that she observed the same type of treatment. Doc. 40, pp. 4-5.

Perkins did not notify Messenheimer of these complaints. Doc 39, p. 8. Instead, on September 17, 2014, Perkins brought the complaints to the attention of Eric Gordon. Doc. 36, p. 1, ¶ 4 (Perkins Aff.). Perkins advised Gordon that Messenheimer "had failed to demonstrate the ability to consistently present a friendly and professional image as it pertained to associates and WFCs who worked under her supervision." Doc. 36, p. 1, ¶ 4. Gordon and Perkins decided to demote Messenheimer to an associate position and transfer her to a different work area due to her record of demeanor-related issues with WFCs and associates dating back to 2009. Doc. 36, p. 1, ¶ 5.

On September 18, 2014, while at work, Messenheimer had an episode of Meniere's disease. Doc. 38, p. 121. She experienced vomiting, vertigo, and dizziness. Doc. 38, p. 43. Perkins called an ambulance and Messenheimer was taken to the hospital. Doc. 38, p. 121. Messenheimer was out of work for eleven days on medical leave. Doc. 38, p. 52. She returned from medical leave on September 29, 2014, at which time Gordon and Perkins met with her to notify her of their decision to demote her. Doc. 36, p. 1, ¶ 6. In the meeting, Gordon and Perkins explained that they had received complaints that Messenheimer had been rude to her associates and had refused to help them when they came to her for assistance. Doc. 36-1, p. 1. They presented Messenheimer with an Employee Warning Report, outlining their decision and its basis. Doc. 36, p. 1, ¶7; Doc. 36-1, p. 1. At no point in the meeting did Messenheimer tell them she had hearing problems.

### E.  Messenheimer has two meetings with Coastal's Human Resource Department.

#### 1. First Meeting

Following her demotion, Messenheimer submitted a letter to Coastal's Human Resource Department ("HR") requesting that they undertake an investigation into her demotion. Doc. 40,

p. 10.  She alleged that age and disability discrimination were the basis of her demotion.[4]  Doc. 40, p. 10.  HR Director Merrie Smith ("Smith") investigated and found a note in Messenheimer's HR file written on a prescription pad from Messenheimer's doctor, stating, "P[atien]t has Meniere's Disease with intermittent vertigo.  There may be times when she cannot climb a ladder."  Doc. 41-7, p. 1 (Doctor's Note).  Smith stated in her deposition that the note was never given to her directly, and she only checked Messenheimer's file when she was asked to investigate.  Doc. 40, p. 7.  The note is dated August 8, 2013, but there is no evidence regarding when or how the note was added to her file.

On November 7, 2014, Smith and Joe Tucker, Vice President of HR, met with Messenheimer to discuss her allegations in more detail.  Doc. 40, p. 10.  Messenheimer explained that she felt that she was discriminated against because of her recent leave of absence.  Doc. 40, p. 10.  In her deposition, she recalled that Smith and Tucker treated her well during the meeting.  Doc. 38, p. 130.  She did not recall whether she told them during that meeting that she had hearing problems as a result of her Meniere's disease.  Doc. 38, pp. 128-129, 131-132.

## 2. Second Meeting

Sometime after November 7, 2014, Messenheimer requested a second meeting with the HR department so that she could explain that she has Meniere's disease and related vertigo and hearing problems.  Doc. 38, pp. 131-33.  Smith said that she did not know Messenheimer used hearing aids.  Doc. 40, p. 7.  The new information did not change Coastal's position regarding Messenheimer's demotion.  Doc. 40, pp. 10-11.

Thereafter, Messenheimer filed a charge against Coastal with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on retaliation, age, and

---

[4] Messenheimer's Complaint does not allege age discrimination.  Doc. 1.

disability. The EEOC issued a right-to-sue letter on January 12, 2017, and Messenheimer filed her Complaint on April 7, 2017. Doc. 1-1, p. 1 (EEOC Right-to-Sue Letter); Doc. 1, p. 1.

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The movant "bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "Inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Id.* at 587 (internal quotations and citations omitted). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. The non-moving party must present specific facts that demonstrate there is a genuine issue of material fact for trial. *Id.* at 587. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1986).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A genuine issue for trial exists 'if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.'" *Muncie Power Producers, Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 248). Thus, for a plaintiff to avoid summary judgment, "there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Accordingly, in determining whether summary judgment is warranted, a judge generally asks "whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Id.* (citation omitted).

### III. ANALYSIS

Messenheimer makes three claims against Coastal: (1) Coastal discriminated against her by failing to accommodate her Meniere's disease in violation of the ADA, 42 U.S.C. § 12112; (2) Coastal discriminated against her by demoting her due to symptoms of her disability after she took a Meniere's-related medical leave in violation of 42 U.S.C. § 12112 and Ohio Rev. Code § 4112.02; and (3) Coastal retaliated against her by demoting her due to her disability and by failing to reinstate her to a supervisory position constituting a violation of 42 U.S.C. § 12203. Doc. 1, pp. 4-6, ¶¶ 23, 26, 30, 33, 38.

### A. Failure to Accommodate Claim

Messenheimer claims that Coastal discriminated against her by failing to accommodate her disability, limitations associated with her Meniere's disease. Doc. 1, pp. 4-5, ¶¶22-28. She experiences two Meniere's-related limitations: hearing loss and vertigo. Doc. 38, pp. 121, 156-57. The ADA requires employers to make "reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability . . . , unless . . . the accommodation would impose an undue hardship . . . ." 42 U.S.C. § 12112(5)(b).

Messenheimer seeks to establish a prima facie case for failure to accommodate under the ADA using indirect evidence. Doc. 41, p. 8. To establish a prima facie case using indirect evidence, Messenheimer must show that (1) she is an individual with a disability; (2) she is otherwise qualified, with or without accommodation; (3) Coastal knew or had reason to know of the disability; (4) she requested an accommodation from Coastal; and (5) Coastal failed to provide an accommodation. *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018); *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011). "Once a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer." *Id.* "If [the] plaintiff's evidence creates a genuine dispute at each stage of this inquiry, plaintiff defeats summary judgment." *Kovac v. Superior Dairy, Inc.*, 998 F. Supp. 2d 609, 623 (N.D. Ohio 2014) (internal quotations omitted).

Coastal claims, with respect to elements one, three, and four, that Messenheimer cannot establish a prima facie case because (1) Messenheimer is not an individual with a disability within the meaning of the Act; (3) Coastal had no knowledge of her Meniere's Disease; and (4) Messenheimer failed to request an accommodation. Doc. 27, p. 11.

### 1. Whether Messenheimer has a disability.

Coastal first argues that Messenheimer does not have a disability within the meaning of the ADA. Doc. 27, p. 11. The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1).[5]

---

[5] Coastal bases its argument on *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002) where the Supreme Court held that the terms "substantially" and "major" in the definition of disability under the ADA "need

The regulations define physical impairment as any "disorder or condition . . . affecting one or more body systems, such as . . . special sense organs . . . ." 29 C.F.R. § 1630.1(c)(4). Major life activities include hearing, walking, and standing. 29 C.F.R. § 1630.2(i)(1)(i). For a major life activity to be considered substantially limited under the ADA, it must be substantially limited "as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). However, "'[s]ubstantially limits' is not meant to be a demanding standard." *Id.* Furthermore, "[a]n impairment that is episodic or in remission *is* a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(d) (emphasis supplied). [6]

Messenheimer was diagnosed with Meniere's disease sometime in 2008-2009. Doc. 38, pp. 41-42. During episodes of Meniere's disease, Messenheimer experiences severe dizziness, nausea, and vomiting, and her ability to stand and walk is severely limited as compared to most people in the general population. Doc. 38, pp. 43, 46, 121. She has also used hearing aids since June of 2014 due to "severe hearing loss." Doc. 38, pp. 43, 46. The primary purpose of the ADA Amendment Act of 2008 was to "reinstat[e] a broad scope of protection under the ADA." Pub. L. No. 110-325, § 2(b)(1), 122 Stat. 3553 (Sept. 25, 2008). As such, the Court finds that Messenheimer has made a sufficient showing that she has a disability within the meaning of the ADA. *See Spencer v. National City Bank*, 732 F. Supp. 2d 778 (S.D. Ohio 2010) (finding that the plaintiff's Meniere's disease qualified as a disability within the meaning of the ADA).

---

to be interpreted strictly to create a demanding standard for qualifying as disabled . . . ." 534 U.S. 184, 197 (2002). Doc. 27, pp. 9-11. However, in the ADA Amendments Act of 2008, Congress explicitly overruled *Toyota Motor Mfg.*, stating that one of the purposes of the Amendment "[is] to convey congressional intent that the standard created by the Supreme Court in Toyota Motor Mfg., Kentucky, Inc. v. Williams . . . for 'substantially limits' . . . has created an inappropriately high level of limitation necessary to obtain coverage under the ADA . . . ." ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(5), 122 Stat. 3553 (Sept. 25, 2008).

[6] As best the Court can tell, Coastal relies on federal regulations that were in effect prior to 2012 to support its interpretation of what it means to "substantially limit a major life activity." Doc. 27, p. 12. The current version of 29 C.F.R. § 1630.2, defining what it means to substantially limit a major life activity, is informed by the ADA Amendments Act of 2008 and took effect on April 4, 2012, six years ago.

### 2. Whether Coastal had knowledge of Messenheimer's disability.

Coastal next contends that Messenheimer fails to establish that it knew or had reason to know that she has a disability. "[A] person alleging a disability protected by the ADA must establish that his employer had either actual or constructive notice of the disability." *Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 828-29 (S.D. Ohio 2004). "An employer knows of a disability when an employee tells the employer of his or her condition. The employer need only know the underlying facts of the condition . . . the employee need not label his condition as a disability." *Hammon v. DHL Airways, Inc.*, 980 F. Supp. 919, 926 (S.D. Ohio 1997), *aff'd*, 165 F.3d 441 (6th Cir. 1999) (internal quotations and citations omitted); *see also, Grabowski v. QBE Americas, Inc.*, 2017 WL 1077667, at *7 (E.D. Mich. Mar. 22, 2017).

"Knowledge of an employee's symptoms, however, does not necessarily equate to knowledge of his disability." *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 369 (6th Cir. 2013); *see also Brown*, 305 F. Supp. 2d at 829 ("Knowing that an employee has health problems. . . is not the same as knowing that the employee suffers from a disability"). In *Hudson v. First Solar, Inc.*, 2014 WL 12600136, at *3 (N.D. Ohio Mar. 28, 2014), the court found that the defendant lacked knowledge of the plaintiff's disability, gastroparesis, because the symptoms the defendant was aware of were "vague, generalized complaints, rather than complaints obviously associated with a disabling condition." Thus, for a defendant to be deemed to have constructive knowledge of a plaintiff's disability, there must be "obvious signs or strong implications" to suggest that the plaintiff has a disability. *Id.*

Messenheimer proffers three reasons to support her allegation that Coastal had knowledge of her Meniere's disease: (1) she had to leave work on two occasions due to episodes of Meniere's disease; (2) her Meniere's disease "has been clearly documented with [Coastal] for

a number of years," citing the doctor's note, dated August 7, 2013, found in Messenheimer's HR file; and (3) her manager, Barb Perkins, made a comment during Messenheimer's orientation in the Labeling Department regarding Messenheimer's ability to go up and down ladders. Doc. 41, p. 12-13.

Messenheimer had two episodes of Meniere's disease that caused her to leave work and seek medical attention. Doc. 38, pp. 121-23. The first episode occurred while Messenheimer was working in Area C, sometime prior to July 7, 2013, and the second occurred on September 18, 2014, while she was working in the Labeling Department. Doc. 38, p. 121. On both occasions, she exhibited symptoms, including vomiting, dizziness, and vertigo. Doc. 38, p. 43. McGavern and Perkins, Messenheimer's managers at the times of each incident, respectively, have testified that they had no knowledge that Messenheimer had a medical condition that would restrict her ability to work. Doc. 36, p. 1, ¶ 8; Doc 34, p. 2, ¶ 11. Perkins did know, however, that Messenheimer had vertigo.[7] Doc. 36, p. 1, ¶ 8.

As for the doctor's note, Smith discovered it in Messenheimer's HR file on October 7, 2014, after Messenheimer had been demoted. The note stated, "P[atien]t has Meniere's disease with intermittent vertigo. There may be times when she cannot climb a ladder." Doc. 40, p. 7-8; Doc. 41-7, p. 1. Messenheimer has proffered no evidence of when or to whom she presented her doctor's note and there is no evidence showing when it was added to her file. However, viewing the facts in the light most favorable to Messenheimer, the Court finds that Messenheimer has met

---

[7] With regard to Perkins' comment about Messenheimer's ability to go up and down ladders, Perkins has testified in her deposition that she did not think Messenheimer might have trouble doing so when she made the comment. She testified that it was something she would typically say to new employees in the Labeling Department because it was part of the job function they would have to do. Doc. 39, p. 5. In her own deposition, Messenheimer recalls that Perkins explained that the previous Labeling Department supervisor frequently had to go up and down a ten-foot ladder to unjam a conveyor that would frequently jam. Doc. 38, p. 106. Messenheimer stated that she or someone else in the department went up and down ladders regularly. Doc. 38, p. 123-24. Furthermore, Messenheimer was never disciplined for failing to climb ladders.

her burden, for the purposes of summary judgment, of establishing that Coastal had knowledge of her Meniere's disease and vertigo as early as August 2013, the date on which the doctor's note was written.  Doc. 41-6, p. 1.

Although Messenheimer does not specifically identify her hearing loss as something Coastal knew or should have known about, she raises the issue of her hearing loss repeatedly throughout her brief.  In *Matuska v. Hinckley Township*, 56 F. Supp.2d 906, 917 (N.D. Ohio 1999), the district court observed that the ADA distinguishes between knowledge of a disability and knowledge of any limitations related to that disability.  The court explained,

> The distinction is significant because the ADA only requires employers to accommodate the known physical or mental limitations of the employee.  42 U.S.C. § 12112(b)(5)(A).  Accordingly, if [the plaintiff] failed to inform the defendants of the limitations that he experienced as a result of his physical and mental impairments, then he cannot establish that the defendants knew or had reason to know of his disability.

*Id.*  Even if it could be said that Coastal knew Messenheimer had Meniere's disease and related vertigo, there is no evidence in the record to show that Messenheimer informed Coastal of the hearing loss she experienced as a result of her impairment.  *See id.*  So, while Messenheimer has met her prima facie burden in showing Coastal had knowledge of her Meniere's disease and her related vertigo, she has failed to establish that Coastal had any knowledge of her hearing loss caused by her disability.

### 3. Whether Messenheimer requested an accommodation.

Coastal argues that it was not obligated to accommodate Messenheimer because she never requested an accommodation.  "The employee . . . bears the burden of proposing reasonable accommodations; and employee's claim must be dismissed if the employee fails to identify and request such reasonable accommodations."  *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 983 (6th Cir. 2011).  "The employer is not required to speculate as to the

extent of the employee's disability or the employee's need or desire for an accommodation."

*Gantt v. Wilson's Sporting Goods Co.*, 143 F.3d 1042, 1046-47 (6th Cir. 1998). Here, there is no evidence that Messenheimer requested an accommodation.

### a. Vertigo

As an initial matter, Messenheimer admits she never requested an accommodation due to her vertigo while working in the Labeling Department. Doc. 38, p. 107. Furthermore, she reports that she had no problem climbing ladders while working in the Labeling Department. Doc. 38, p. 123-24.

### b. Hearing Loss

As stated above, Messenheimer has not established that Coastal had knowledge of her hearing loss. Even in the event that it did, the evidence shows she never requested an accommodation.

Coastal demoted Messenheimer on September 29, 2014, after an associate working under Messenheimer's supervision filed a complaint with Perkins, stating that Messenheimer treated her associates rudely and refused to help them when they had questions. Doc. 39, pp. 5-7. This and additional complaints formed the basis for Messenheimer's demotion and were recorded in a written Employee Warning Report presented to Messenheimer upon her demotion:

> Carol has failed to demonstrate the ability to consistently present a friendly and professional image.

> Due to recent complaints from associates and co-workers, Carol has demonstrated rude behavior towards an associate and lack of wanting to help out when an associate is asking for help.

> When her area gets behind it is hard for Carol to multitask which causes her to get upset and lash out at others.

Doc. 36-1, p. 1.  Messenheimer did not tell Perkins or Gordon, the authors of the report, that she had hearing loss at the time of her demotion.  Doc. 38, p. 126.  She acknowledges that she never asked anyone at Coastal for an accommodation while working in the Labeling Department.  Doc. 38, p. 107.  During her first meeting with HR, after her demotion, Messenheimer could not recall whether she told them that she had hearing loss; she did inform HR that she has hearing loss in her second meeting with them, over two months after she had been demoted.  Doc. 38, p. 131; Doc. 40, pp. 7, 10-11.

In her brief, Messenheimer contends that her "request for an investigation following her demotion and comments during those meetings [with HR] were requests for accommodations." Doc. 41, pp. 13-14.  But, even if her comments to HR after she had been demoted qualified as a request for accommodation,[8] "excusing workplace misconduct to provide a fresh start/second chance to an employee whose disability could be offered as an after-the-fact excuse is not a required accommodation under the ADA."  *Parsons v. Auto Club Group*, 565 F. App'x 446, 449 (6th Cir. 2014) (quoting *Davila v. Quest Corp., Inc.*, 113 F. App'x 849, 854 (10th Cir. 2004)). *See also Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 90 (1st Cir. 2012) ("When an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be 'too little, too late'"); *Brookins v. Indianapolis Power and Light Co.*, 90 F. Supp.2d 993, 1007 (S.D. Ind. 2000) ("Since reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability").  Like the plaintiff in *Parsons*,

---

[8] Requests for accommodations must be specific enough to reasonably inform the employer of a reasonable accommodation.  *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 635 (6th Cir. 1998); *Deister v. AAA Auto Club of Michigan*, 91 F. Supp.3d 905, 924 (E.D. Mich. 2015) (holding that the plaintiff did not request an accommodation by advising his employer to review his medical records).  As Messenheimer alleges that she merely informed HR that she had hearing limitations due to her disability (after she had been demoted), she did not make a request for an accommodation, let alone one specific enough to satisfy the requirements of 42 U.S.C. § 12112(b)(5).

Messenheimer has provided no evidence that she asked for an accommodation *prior to* her demotion for either of her alleged limitations—vertigo and hearing loss—and she has thus failed to make out a prima facie case for failure to accommodate.

Additionally, Messenheimer now argues that, due to her hearing loss, she had been unaware that she was not responding to her associates' questions.[9]  In other words, Messenheimer submits that she did not ask for an accommodation prior to her demotion because she was unaware that she needed one.  Doc. 41, p. 13.  However, she cites no legal authority to support an argument that an employer must offer an accommodation to an employee when the employee not only fails to ask for one but doesn't even know she needs one.  This argument, too, fails.

### B. Discrimination Claims

Messenheimer next argues that her demotion was discriminatory under the ADA and O.R.C. § 4112.02.  "The Supreme Court of Ohio consistently has held courts considering disability discrimination claims pursuant to O.R.C. § 4112.02 may look to case law and regulations interpreting the [ADA] for guidance."  *Bloomfield v. Whirlpool Corp.*, 984 F. Supp.2d 771, 776 (N.D. Ohio 2013).  *See also Columbus Civ. Serv. Comm. v. McGlone*, 697 N.E.2d 204, 206-207 (Ohio 1998).  As such, the Court will analyze Messenheimer's federal and Ohio discrimination claims together, applying the same analysis that it applies to her ADA claim to her Ohio Rev. Code § 4112.02 claim.  *Bloomfield*, 984 F. Supp.2d at 776.

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of

---

[9] In her deposition, Messenheimer stated that there is no connection between her hearing loss and the claims that she treated associates poorly.  Doc. 38, p. 128.

employment." 42 U.S.C. § 12112(a). Messenheimer seeks to establish her claim for disability discrimination using indirect evidence.[10] Doc. 41, pp. 14-15. Discrimination claims under the ADA using indirect evidence are analyzed using the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing the elements of his or her prima facie case under the relevant statute. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1113-14 (6th Cir. 2001) ("A plaintiff's burden in establishing a prima facie case is not intended to be an onerous one") (citation omitted). If the plaintiff successfully does so, the burden shifts to the defendant to "articulate some legitimate, non-discriminatory reason" for the adverse employment decision. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Finally, if the defendant articulates such a reason, the burden shifts back to the plaintiff to prove that the non-discriminatory reason is merely pretextual. *Id.* To establish that the defendant's proffered non-discriminatory reason for the adverse employment action is pretextual, the plaintiff must show: (1) the proffered reason has no basis in fact; (2) the reason did not actually motivate the defendant's challenged conduct; or (3) the reason was insufficient to warrant the challenged conduct. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003); *Spencer v. National City Bank*, 732 F. Supp.2d 778 (S.D. Ohio 2010). "At all times, [the plaintiff] retains the ultimate burden of persuasion." *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 936 (6th Cir. 2000).

---

[10] Messenheimer does not explicitly state that she seeks to establish her prima facie case using indirect evidence. However, in her Opposition brief, she employs the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). It is well established that this framework applies only when the plaintiff uses indirect evidence to establish her prima facie case. *See Ferrari v. Ford Motor Co.*, 826 F.3d 885 (6th Cir. 2016); *Bloomfield v. Whirlpool Corp.*, 984 F. Supp.2d 771 (N.D. Ohio 2013); *Welsh v. Automatic Data Processing, Inc.*, 954 F. Supp.2d 670 (S.D. Ohio 2013).

### 1. Elements of a Prima Facie Case

There has been a great deal of confusion in the Sixth Circuit regarding the proper prima facie test for disability discrimination based on indirect evidence. Both Coastal and Messenheimer advance a three-prong test in their briefs. Like the parties, some courts in the Sixth Circuit have used the three elements of an ADA prima facie case laid out in *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002): (1) the plaintiff must have a disability within the meaning of the ADA; (2) she must be otherwise qualified to perform her job requirements, with or without reasonable accommodation; and (3) she would not have suffered an adverse employment action but-for her disability.[11] Doc. 41, p. 14; Doc. 27, p. 16. *See Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 445 (6th Cir. Mar. 23, 2017); *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014); *Blazek v. City of Lakewood, Ohio*, 576 F. App'x 512, 516 (6th Cir. 2014); *Donald v. Sybra, Inc.*, 667 F.3d 757 (6th Cir. 2012).

However, other courts in the Sixth Circuit have used the five elements of a prima facie disability discrimination case laid out in *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996): (1) plaintiff must be an individual with a disability; (2) plaintiff must otherwise be qualified for the position, with or without reasonable accommodation; (3) plaintiff must have suffered an adverse employment decision; (4) the employer must have known or had reason to know of the plaintiff's disability; and (5) the plaintiff's position must have remained open while the employer sought other applicants or the individual with a disability was replaced.[12] *See Mitchell v. U.S. Postal Serv.*, -- F. App'x --, 2018 WL 3078564, at *7 n.4 (6th Cir. June 21,

---

[11] In their briefs, Messenheimer and Coastal dispute whether "solely because of" or "but-for" is the correct causation standard. As Messenheimer correctly observed, the Sixth Circuit adopted the but-for standard of causation in 2012 in *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 317 (6th Cir. 2012) ("The sole-cause standard in the end is a creature of the Rehabilitation Act, and that is where we should leave it. The standard does not apply to claims under the ADA").

[12] *Monette* was abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012).

2018); *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891-92 (6th Cir. 2016); *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403 (6th Cir. 2014); *Whitfield v. Tennessee*, 639 F.3d 253, 258-59 (6th Cir. 2011); *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007).

In *Whitfield v. Tennessee*, the Sixth Circuit attempted to remedy the "confusion in this circuit as to the proper test for establishing a prima facie case of employment discrimination under the ADA." 639 F.3d 253 (6th Cir. 2011). The *Whitfield* court explained that:

> *Monette* is cited for the formulation used in *Mahon*, and although *Monette* includes the three-element language, it is not used in the context of establishing a prima facie case for purposes of *McDonnell Douglas*, but is rather in the context of what is required for *recovery* under the ADA. Thus, it appears as though the *Mahon* court misread *Monette*. Because conflicts between published cases are resolved in favor of the earlier case, we adopt *Monette*'s five-element test for a prima facie case of employment discrimination under the ADA.

*Id.* at 259. The court went on to explain that "the three-element *Mahon* formulation of a prima facie case makes little sense, as its third element—whether the employee was, in fact, discharged because of the disability—requires at the prima facie stage what the *McDonnell Douglas* burden-shifting framework seeks to uncover only through two additional burden shifts, thereby rendering that framework wholly unnecessary." *Id.* The Sixth Circuit has subsequently affirmed the application of the five-element *Monette* test in ADA discrimination cases. *See Ferrari*, 826 F.3d at 891-92; *Mitchell*, 2018 WL 3078564, at *7 n.4. Therefore, this Court will use the five-element *Monette* test.

Of the five *Monette* elements, Coastal argues that, with respect to the first and fourth elements, (1) Messenheimer does not have a disability within the meaning of the ADA; and (4) that it did not know or have reason to know of Messenheimer's disability. As discussed above, Messenheimer has successfully established that she has a disability and she has met her prima facie burden of showing Coastal knew of her Meniere's disease and vertigo.

Messenheimer argues that, with respect to her hearing loss, she meets her prima facie burden because Coastal "refused to allow [her] to address any alleged shortcomings, and demoted her despite her requests to further discuss the concerns that had arisen because she had difficulty hearing her associates." Doc. 41, p. 16. This argument is without merit. The record shows that Coastal warned Messenheimer about her conduct with employees repeatedly between 2009 and 2014. Throughout that five-year period and numerous meetings with managers, Messenheimer had ample opportunity to address her "alleged shortcomings." Doc. 38, p. 129. Messenheimer admits that she did not inform Coastal that she had trouble hearing until she met with HR, months after her demotion, let alone that she ever requested further discussions regarding "the concerns that had arisen because she had difficulty hearing her associates." Doc. 41, p. 16. *See Matuska*, 56 F. Supp.2d at 917 (holding that if an employee did not notify his employer of a limitation resulting from his disability, the employer does not have knowledge of the disability with regard to that limitation). In sum, Messenheimer meets her prima facie burden with respect to her vertigo stemming from her Meniere's disease, but not her hearing loss.

## 2. Coastal's Non-discriminatory Reason for Demotion

To satisfy its burden to provide a legitimate, non-discriminatory reason for its employment action, "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *Tillotson v. Manitowoc Co., Inc.*, 727 F. App'x 164, 169 (6th Cir. 2018). To support its claim that Messenheimer was in fact demoted because of poor demeanor and leadership skills, Coastal has submitted evidence in the form of affidavits and employee disciplinary records dating from 2009

through September 29, 2014, the date of Messenheimer's demotion.  Doc. 34, pp. 1-2; Doc. 34-1, p.1; Doc. 34-2, p. 1; Doc. 34-3, p. 1; Doc. 34-4, pp. 1-3; Doc. 34-5, p. 1; Doc. 36, pp. 1-2; Doc. 36-1, p.1; Doc. 41-2, pp. 1-2; Doc. 41-6, pp. 1-3.  These show that Messenheimer was repeatedly warned about her demeanor with employees under her supervision.  These problems were noted by the three different managers that oversaw her and occurred while Messenheimer worked in two different work areas.

Moreover, Messenheimer agrees that five different WFCs either stepped down or transferred to other work areas while working under her supervision due to her demeanor.  Doc. 38, p. 97.  She does not dispute that her coworkers routinely complained about her managerial style but argues that their complaints are one-sided or that her coworkers "had it out for [her]."  Doc. 38, pp. 93, 100-01.  Taken together, this evidence shows that Coastal demoted Messenheimer because of her demeanor with coworkers, not because she had vertigo.  Thus, Coastal meets its burden by demonstrating a legitimate, non-discriminatory reason for her demotion.

### 3. Messenheimer cannot show pretext.

Messenheimer relies on two facts to support her position that Coastal's justification is pretextual: (1) "[t]he complaint that ultimately led to her demotion directly related to [her] ability to hear associates, which is impacted due to her Meniere's disease and hearing loss"; and (2) Messenheimer was demoted the day after returning from medical leave after an episode of Meniere's disease.  Doc. 41, pp. 16-17.

On the Employee Warning Report presented to Messenheimer upon her demotion, Coastal listed several reasons for its decision.  Among them, Coastal based its decision on complaints from Messenheimer's associates and coworkers that Messenheimer was rude to

associates and at times would not respond to requests for help from her associates. In her brief, Messenheimer now stresses that, due to her hearing loss, she did not hear the alleged requests for help. This argument fails for three reasons. First, it is undisputed that Coastal did not know Messenheimer had a hearing problem prior to her demotion. Second, failure to help associates was not the only reason given for her demotion. The other stated reasons for her demotion include (1) failure to "consistently present a friendly and professional image"; (2) "rude behavior towards an associate"; and (3) difficulty multitasking when her area gets behind "which causes her to get upset and lash out at others." Doc. 36-1, p. 1. Finally, Messenheimer herself admitted in her deposition that there is no connection between her ability to hear and allegations that she treated her associates poorly. Doc. 28, p. 128. She has presented no evidence to suggest that the allegations of her poor treatment of associates were false. Nor is there evidence to suggest that Coastal demoted her because of her Meniere's disease, vertigo, or hearing loss.

As to her claim that Coastal's reason for demoting her was pretextual based on the fact that she was demoted on the day she returned from medical leave, "[t]his Circuit has made it clear that 'temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence.' This is particularly the case where the defendant provides reasonable evidence of alternative causation." *Blume v. Potter*, 289 F. App'x 99, 106 (6th Cir. 2008) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)). Here, Coastal provides reasonable evidence of alternative causation, i.e, a long record of poor managerial performance. *See id.* Moreover, the evidence shows that the decision to demote Messenheimer was made the day prior to her taking medical leave. Doc. 36, p. 1, ¶¶ 4-5. In sum, Messenheimer has failed to establish that there is a genuine issue of material fact regarding

whether Coastal's non-discriminatory reason for demoting her was pretextual.  Therefore, Coastal is entitled to summary judgment on Messenheimer's discrimination claim.

### C.  Retaliation Claim

The ADA prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203.

To establish a prima facie case for retaliation, a plaintiff must demonstrate that (1) she engaged in activity protected by the ADA; (2) "this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." *Blume*, 289 F. App'x at 105 (citing *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000)), *see also Welsh v. Automatic Data Processing, Inc.*, 954 F. Supp.2d 670, 684 (S.D. Ohio 2013); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003).  Protected activities include: requesting accommodations, making charges, testifying, assisting, or participating in enforcement proceedings in connection with an unlawful employment practice.  42 U.S.C. § 2000e-3.

Coastal argues in its Motion for Summary Judgment that Messenheimer cannot satisfy the prima facie case for retaliation because she "was not engaged in an activity protected [by] the [A]ct and [Costal] had no [k]nowledge of said activity."  Doc. 27. p. 17.  In her Complaint, Messenheimer has proffered only vague allegations that she "complained internally about Defendant's discriminatory practices," that she "eventually filed an EEOC charge on January 30,

2015," and that "Defendant retaliated, and continues to retaliate, against Plaintiff by failing to promote her back to a position as supervisor or otherwise advance her employment to a position that it would be currently, absent Defendant's discrimination."  Doc. 1, p. 5, ¶¶ 31-32; Doc 1, p. 6, ¶ 7.

In her Brief in Opposition to Defendant's Motion for Summary Judgment, Messenheimer did not address Coastal's arguments and did not even mention her retaliation claim.  Doc. 41. Federal Rule of Civil Procedure 56(e) states, "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may (1) give an opportunity to properly support or address the fact; (2) consider the facts undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order."  Fed. R. Civ. P. 56(e).  *See Notarnicola v. Johnson Controls Inc.*, 2014 WL 1304591, at *7 (E.D. Mich. Mar. 28, 2014) (granting the defendant's motion for summary judgment on an ADA claim due to the plaintiff's failure to address the claim in his opposition brief).  Here, the facts with respect to Messenheimer's retaliation claim are undisputed and Coastal has shown that it is entitled to summary judgment.  Accordingly, the Court grants summary judgment to Coastal on Messenheimer's retaliation claim.

## IV. Conclusion

For the reasons explained above, the Court **GRANTS** Defendant Coastal Pet Products,

Inc.'s Motion for Summary Judgment in full.  (Doc. 26.)


    IT IS SO ORDERED.

    Dated: July 27, 2018

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge